## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RACHEL K.,                          :
                                    :
        Plaintiff,                  :
                                    :        CIVIL ACTION NO.
        v.                          :        1:21-cv-01208-RGV
                                    :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
        Defendant.                  :


## <u>FINAL ORDER</u>

This is an action to review the determination by the Commissioner of Social

Security ("the Commissioner") that claimant Rachel K. ("claimant") is not entitled

to a period of disability, disability insurance benefits ("DIB"), and supplemental

security income ("SSI") under Title II and Title XVI, respectively, of the Social

Security Act (the "Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  For the reasons that

follow, the Commissioner's decision denying claimant's applications for DIB and

SSI is **AFFIRMED**.[1]

---

[1] The parties have consented to have a magistrate judge conduct any and all
proceedings, including the entry of final judgment.  <u>See</u> [Docket entries dated
03/25/2021 & 03/26/2021].

# I.  PROCEDURAL HISTORY

Claimant, who was born on January 10, 1967, graduated high school and attended at least one year of college, and has past relevant work experience as a warehouse worker and child monitor, filed applications for DIB and SSI on October 17, 2018,[2] alleging an onset of disability as of June 15, 2018, due to heart palpitations, deteriorated discs in her lower back and neck, high blood pressure, obesity, diabetes, and arthritis in her thumbs, wrists, ankles, knees, and back.  (Tr.[3] at 41, 43, 45, 66-67, 73-74, 88, 90-91, 104-05, 107-10, 126-27, 129-30, 146-47, 149-50, 156, 160-61, 167, 255-70, 291-92, 300, 303, 312-20, 348, 362, 367, 1220).  Claimant's

---

[2] The Commissioner published final rules entitled, "Revisions to Rules Regarding the Evaluation of Medical Evidence; Correction," on January 18, 2017, which became effective as of March 27, 2017.  See 82 FR 15132-01, 2017 WL 1105368 (Mar. 27, 2017).  "Some of the new rules apply only to applications/claims filed before March 27, 2017, and others apply only to applications/claims filed on or after March 27, 2017."  Christensen v. Saul, DOCKET NO. 1:19cv68-MOC, 2019 WL 6359764, at *2 n.1 (W.D.N.C. Nov. 27, 2019) (citations omitted).  Since claimant "filed her applications after March 27, 2017, the Commissioner's revised [R]egulations apply to the evaluation of her claims."  A.A.S. v. Comm'r of Soc. Sec., Case No: 3:20-CV-74-MSH, 2021 WL 4313603, at *3 (M.D. Ga. Sept. 22, 2021) (citations omitted).

[3] See [Doc. 10] and its attachments for the electronic Certified Administrative Record ("eCAR"), hereinafter referred to as ("Tr. at __").  With the exception of the eCAR, which is cited according to the actual transcript page number shown on the bottom right corner of the record, the cited document and page numbers in this Final Order refer to the document and page numbers shown on the Adobe file reader linked to this Court's electronic filing database (CM/ECF).

applications were denied initially and on reconsideration, (Tr. at 73-150, 156-73), and claimant then requested a hearing before an Administrative Law Judge ("ALJ"), (Tr. at 177-225).  On September 3, 2020, the ALJ, Henry Kramzyk, held the administrative hearing by telephone "[d]ue to the extraordinary circumstances presented by the COVID-19 pandemic[.]"  (Tr. at 36-72).[4]

On November 18, 2020, the ALJ issued a decision denying claimant's DIB and SSI applications upon finding that claimant had not been under a "disability" as defined by the Act from June 15, 2018, through the date of his decision.  (Tr. at 12-35).   Specifically, the ALJ found that claimant had the following severe impairments:

> obesity; type II diabetes mellitus; hypertension; left ventricular hypertrophy; left atrial enlargement; tricompartmental osteoarthritis in the right knee, tricompartmental osteoarthritis in the left knee; status post left ACL reconstruction (2009); bilateral calcaneal enthesophytes; multilevel degenerative disc disease, osteophytes, foraminal stenosis, and facet arthropathy in the cervical spine; mild to moderate spinal canal stenosis at C4-C5, C5-C6, and C6-C7; multilevel thoracic spondylosis; degenerative changes of the lumbosacral spine, resulting in moderate bilateral L5-S1 foraminal narrowing and severe right L4-L5 foraminal narrowing; degenerative changes of the bilateral sacroiliac joints; and degenerative changes in the symphysis pubis (hips).

---

[4] At the administrative hearing, Jennifer Guediri testified as the vocational expert ("VE").  See (Tr. at 65-71); see also (Tr. at 369-70 (VE's resume)).

(Tr. at 17-18 (emphasis and citations omitted)).  He also concluded that claimant had non-severe impairments that included visual impairments, upper extremity impairments, and major depressive disorder, but that she did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (Tr. at 18-21 (citations omitted)).[5]  The ALJ then found that claimant retained the following residual functional capacity ("RFC"):

> [Claimant can] lift, carry, push, pull up to 20 pounds occasionally and 10 pounds frequently; sit for a total of up to 6 hours a day; and stand and/or walk for a total of up to 6 hours a day.  *See* 20 CFR 404.1567(b); 20 CFR 416.967(b) ("Light work").  She can frequently push/pull foot controls with both lower extremities.  She can never climb ladders, ropes, or scaffolds, but occasionally climb ramps and stairs.  She can occasionally balance and stoop, but never crouch, kneel, or crawl.  She needs to avoid concentrated exposure to extreme heat.  She needs to avoid all exposure to hazards such as dangerous machinery and unprotected heights.

---

[5] The ALJ determined that claimant met the insured status requirements of the Act through June 30, 2023.  (Tr. at 15, 17 (citation omitted)).  "To be eligible for [DIB], a claimant must demonstrate a disability on or before the last date on which she was insured."  Castleman v. Comm'r, Soc. Sec. Admin., 824 F. App'x 927, 927 (11th Cir. 2020) (per curiam) (unpublished) (citations omitted); see also (Tr. at 15-16).  "Unlike DIB claims, SSI claims are not tied to the attainment of a particular period of insurance eligibility."  Latoya R. v. Saul, CIVIL ACTION FILE NO. 1:19-cv-03938-AJB, 2021 WL 1085536, at *1 n.2 (N.D. Ga. Mar. 22, 2021) (citation omitted).  "Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI," and thus, "the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a period of disability, or to recover SSI, although different statutes and regulations apply to each type of claim."  Id. (citations and internal marks omitted).  "Therefore, to the extent that the Court cites to DIB cases, statutes, or regulations, they are equally applicable to [claimant's] SSI claims, and vice versa."  Id.

(Tr. at 23 (emphasis omitted)).   The ALJ then concluded, based on the VE's testimony at the administrative hearing, that claimant was capable of performing her past relevant work as a child monitor as it was "actually performed by her,"[6] and that alternatively, considering her age, education, work experience, and RFC, she was also able to perform other light, unskilled jobs that exist in significant numbers in the national economy, including sorter, marker, and cashier II.  (Tr. at 27-28 (emphasis, citations, and internal marks omitted)).

Claimant sought review by the Appeals Council, (Tr. at 251-54), and on February 17, 2021, the Appeals Council denied claimant's request for review, making the ALJ's decision the final decision of the Commissioner, (Tr. at 1-6). Claimant appealed the decision to the district court seeking review of the Commissioner's decision.  [Docs. 1 & 4].  Specifically, claimant argues on appeal that the ALJ failed to properly evaluate her subjective complaints of pain.  [Doc. 12].[7]  The relevant details of claimant's medical history and the evidence in the

---

[6] Claimant testified that as a child monitor, she usually watched three to four school-aged kids, that she would walk them to and from the bus stop, that the most she had to lift was "[m]aybe about 10 pounds," and that she sat for about 2 hours and was on her feet for about three hours.  (Tr. at 50-51).  The VE classified this job as performed by claimant as a light job with a combination sit/stand option.  (Tr. at 67).

[7] Claimant "did not raise other arguments," and she "thus waived all challenges to the ALJ's decision except the one briefed."  Jones ex rel. Martensen v. Colvin,

record will be set forth as necessary during the discussion of the sole issue raised by claimant.  Thus, the matter is now before the Court upon the administrative record and the parties' briefs, [Docs. 10, 12, & 13], and is ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A); see also Jones v. Comm'r of Soc. Sec., 478 F. App'x 610, 611 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted); Majkut v. Comm'r of Soc. Sec., 394 F. App'x 660, 662 (11th Cir. 2010) (per curiam) (unpublished) (citations omitted).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful

---

No. CV414–130, 2015 WL 4770059, at *3 n.3 (S.D. Ga. Aug. 12, 2015) (citation omitted), adopted by 2015 WL 5168508, at *1 (S.D. Ga. Sept. 2, 2015).

work which exists in the national economy.  42 U.S.C. § 423(d)(2)-(3); D'Andrea v. Comm'r of Soc. Sec. Admin., 389 F. App'x 944, 946 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted).

"The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner." Gibson v. Astrue, Civil Action File No. 1:09-CV-677-AJB, 2010 WL 3655857, at *7 (N.D. Ga. Sept. 13, 2010).  "The claimant bears the primary burden of establishing the existence of a 'disability' and therefore entitlement to disability benefits." Id. (citing 20 C.F.R. § 404.1512(a)); see also Symonds v. Astrue, 448 F. App'x 10, 11 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  The Commissioner utilizes a five-step sequential analysis to determine whether the claimant has met the burden of proving disability. Tisdale v. Soc. Sec. Admin., Comm'r, 806 F. App'x 704, 706 (11th Cir. 2020) (per curiam) (unpublished) (citations omitted); Manzo v. Comm'r of Soc. Sec., 408 F. App'x 265, 266 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted); Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The claimant must prove at step one that she is not undertaking substantial gainful activity. See Manzo, 408 F. App'x at 266 (citations omitted); 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments which

significantly limits her ability to perform basic work-related activities. See Manzo, 408 F. App'x at 266 (citations omitted); 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. See Salazar v. Comm'r of Soc. Sec., 372 F. App'x 64, 66 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work. See D'Andrea, 389 F. App'x at 945 (citation omitted); 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).[8] At step five, the Regulations direct the Commissioner to consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. See Manzo, 408 F. App'x at 267 (citations omitted); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).[9] "The Commissioner must produce evidence

---

[8] "A claimant's RFC is assessed between steps three and four of the sequential analysis, and is a determination of . . . her remaining ability to engage in work despite impairments." White v. Comm'r of Soc. Sec., CASE NO. 3:18-CV-61-MSH, 2018 WL 6683004, at *3 (M.D. Ga. Dec. 19, 2018). "It is the most that a claimant can do despite being impaired." Id. (citation omitted).

[9] As explained by Doughty, the temporary shifting of the burden at step five to the Commissioner is a creature of judicial gloss on the Act and not mandated by the

that there is other work available in the national economy that the claimant has the capacity to perform." <u>Holmes v. Astrue</u>, Civil Action File No. 1:09–CV–01523–AJB, 2010 WL 2196600, at *12 (N.D. Ga. May 27, 2010).  In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  <u>Doughty</u>, 245 F.3d at 1278 n.2 (citation omitted).

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  <u>See</u> 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy.  <u>Doughty</u>, 245 F.3d at 1278 & n.2 (citations omitted).

### III.  SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited.  <u>Lynch v. Astrue</u>, 358 F. App'x 83, 86 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted); <u>see also</u> <u>Jasmatie R. v. Saul</u>, CIVIL ACTION FILE NO. 1:19-cv-03541-AJB, 2020 WL 5406172, at *3 (N.D. Ga. Sept. 9,

---

statutes.  245 F.3d at 1278 n.2 (citations omitted); <u>see also</u> <u>Foote v. Chater</u>, 67 F.3d 1553, 1559 (11th Cir. 1995) (per curiam) (citation omitted) ("Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the [Commissioner] to show other work the claimant can do.").  "Until step five is reached, the burden is on the claimant to introduce evidence in support of her application for benefits." <u>Salazar</u>, 372 F. App'x at 66 (citation omitted).

2020). "Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues." Russell v. Astrue, 742 F. Supp. 2d 1355, 1367 (N.D. Ga. 2010) (citing Fields v. Harris, 498 F. Supp. 478, 488 (N.D. Ga. 1980)); see also Sherna S. R. v. Saul, CIVIL ACTION FILE No. 1:18-cv-05893-AJB, 2020 WL 1698821, at *3 (N.D. Ga. Apr. 7, 2020) (citations omitted). "This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner." Russell, 742 F. Supp. 2d at 1367; see also Garrett v. Comm'r, Soc. Sec. Admin., No. 21-11749, 2022 WL 3226308, at *3 (11th Cir. Aug. 10, 2022) (per curiam) (citation omitted); Pinckney v. Comm'r of Soc. Sec., 853 F. App'x 347, 349 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted); Loveless v. Comm'r, Soc. Sec. Admin., 678 F. App'x 866, 868 (11th Cir. 2017) (per curiam) (unpublished) (citation omitted); Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam) (citation omitted). If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. See Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (per curiam) (quoting 42 U.S.C. § 405(g)); Foote, 67 F.3d at 1560 (citation omitted).

"The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding," and

"[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (last alteration in original) (citations omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Id.; see also Peterson v. Comm'r of Soc. Sec., No. 21-10086, 2021 WL 3163662, at *1 (11th Cir. July 27, 2021) (per curiam) (unpublished) (citation omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Somogy v. Comm'r of Soc. Sec., 366 F. App'x 56, 62 (11th Cir. 2010) (per curiam) (unpublished) (citations and internal marks omitted); see also Thomas-Joseph v. Comm'r of Soc. Sec., No. 21-11020, 2022 WL 1769134, at *1 (11th Cir. June 1, 2022) (per curiam) (citation omitted); Alvarez v. Comm'r of Soc. Sec., 848 F. App'x 823, 824 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted). In considering the evidence in the record, this Court must consider the record as a whole. Lynch, 358 F. App'x at 86 (citations omitted). It may not affirm the Commissioner's decision by referring only to those parts of the record which support the same conclusion. Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983) (per curiam); see also John A. v. Comm'r, Soc. Sec. Admin., CIVIL ACTION FILE NO. 3:17-cv-00141-RGV, 2019 WL 994970, at *13 (N.D. Ga. Feb. 19, 2019)

11

(citation omitted).  That is, "the Commissioner's findings of fact must be grounded in the entire record; a decision that focuses on one aspect of the evidence and disregards other contrary evidence is not based upon substantial evidence." Wooten v. Astrue, No. CV 309-023, 2010 WL 2521047, at *2 (S.D. Ga. May 26, 2010) (citation omitted), adopted by 2010 WL 2521045, at *1 (S.D. Ga. June 21, 2010). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

However, if the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the evidence preponderates against the Commissioner's decision. Dyer, 395 F.3d at 1210 (citation omitted); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam) (citation omitted); Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam) (citation omitted); Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996) (per curiam) (citation omitted).  "In contrast, review of the ALJ's application of legal principles is plenary." Bailey v. Astrue, 739 F. Supp. 2d 1365, 1376 (N.D. Ga. 2010) (citing Foote, 67 F.3d at 1558; Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam)).  Furthermore, "an error is harmless if it does not affect the ALJ's ultimate decision." Loveless, 678 F. App'x at 868 (citation omitted).

12

# IV.  ANALYSIS OF CASE

Claimant asserts that the ALJ's decision is not supported by substantial evidence and should be reversed because the ALJ erred in his assessment of her subjective complaints of pain.  See [Doc. 12].  In particular, claimant argues that remand is required because the ALJ failed "to properly apply the three-part pain standard established by the Eleventh Circuit for adjudicating claimants based upon complaints of pain."  [Id. at 8].  She also asserts that the ALJ failed to comply with Social Security Ruling ("SSR")[10] 96-7p.[11]  [Id. at 9-11].  In response, the Commissioner contends that the ALJ considered "all the evidence, objective and

---

[10] SSRs "'are binding on all components of the Social Security Administration.'" Brewer v. Astrue, No. 8:09-CV-132-T-27TGW, 2010 WL 454916, at *1 n.1 (M.D. Fla. Feb. 9, 2010) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 n.9 (1990); 20 C.F.R. § 402.35(b)(1)).  "Although SSRs do not have the force of law, they are entitled to deference if consistent with the . . . Act and regulations." Id. (citation omitted).

[11] "On March 16, 2016, [SSR] 16-3p superseded SSR 96-7p" and "eliminate[d] the use of the term 'credibility' and clarifie[d] 'subjective symptom evaluation is not an examination of an individual's character.'"  Larsen v. Berryhill, CV 118-038, 2019 WL 1590607, at *3 n.2 (S.D. Ga. Mar. 19, 2019) (citations omitted), adopted by 2019 WL 1586759, at *1 (S.D. Ga. Apr. 12, 2019).  Thus, as the Commissioner notes, claimant "erroneously relies on SSR 96-7p[.]" [Doc. 13 at 7 n.3 (citation omitted)]. In any event, "while SSR 16-3p eliminates the term 'credibility' from the analysis and replaces it with 'subjective symptom evaluation,' SSR 16-3p does not alter what the ALJ must consider in evaluating a claimant's symptoms," Sheehan v. Comm'r of Soc. Sec., Case No: 2:16-cv-353-FtM-MRM, 2017 WL 4231104, at *13 (M.D. Fla. Sept. 25, 2017) (citations omitted), and here, "the ALJ's careful, thorough [] analysis survives under either 96-7p or 16-3p," Lane v. Berryhill, CV616-024, 2017 WL 976923, at *4 n.8 (S.D. Ga. Feb. 16, 2017), adopted by 2017 WL 971369, at *1 (S.D. Ga. Mar. 13, 2017).

subjective" and "complied with the [] regulatory criteria, SSR 16-3p, and Eleventh Circuit precedent" in concluding that "although [claimant's] symptoms may be attributed to her impairments, the evidence did not support her statements as to the intensity and limiting effects of her symptoms" and that the ALJ's "subjective symptom findings were both explicit and supported by citation to specific evidence that provided a reasonable basis for rejecting [her] testimony," and the "Court should not disturb a clearly articulated [symptom assessment] supported by substantial evidence." [Doc. 13 at 8, 15 (last alteration in original) (citations and internal marks omitted)]. The Court agrees with the Commissioner.

Testimony regarding claimant's pain and subjective limitations is evaluated under the standard set forth by the Eleventh Circuit in Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam):

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [limitations]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [limitations].

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam) (citing Holt, 921 F.2d at 1223); see also Pierson v. Comm'r of Soc. Sec., 494 F. App'x 930, 932 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted); Henderson v. Berryhill, CV417-225, 2019 WL 1179426, at *2 (S.D. Ga. Jan. 22, 2019) (citation

omitted), adopted by 2019 WL 1186854, at *1 (S.D. Ga. Mar. 12, 2019). "When the record shows that the [claimant] has a medically determinable impairment that could reasonably be expected to produce [her] symptoms, such as pain, the ALJ must then evaluate the intensity and persistence of the symptoms so that he can determine how the symptoms limit the [claimant's] capacity for work." Finnie v. Berryhill, CIVIL ACTION NO. 1:16-CV-02659-AT-LTW, 2018 WL 1190241, at *5 (N.D. Ga. Feb. 20, 2018) (citations omitted), adopted by 2018 WL 1184798, at *1 (N.D. Ga. Mar. 7, 2018). "The ALJ may consider the history and testimony, medical signs and laboratory findings, medical opinion evidence, and any other evidence of record describing how the pain affects [claimant's] daily activities and ability to work." Henderson, 2019 WL 1179426, at *2 (citations omitted); see also Jeffrey H. v. Comm'r, Soc. Sec. Admin., CIVIL ACTION FILE NO. 1:17-CV-4203-JFK, 2019 WL 1242845, at *9 (N.D. Ga. Mar. 18, 2019) (citations omitted) (noting factors to be considered under the Regulations include daily activities; location, duration, frequency, and intensity of claimant's symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication; treatment received; measures used for the relief of symptoms; and any other factors concerning the functional limitations and restrictions due to claimant's symptoms).

The ALJ's reasons for rejecting testimony regarding subjective symptoms must be supported by substantial evidence, and "where such testimony is critical, he must articulate specific reasons for questioning the claimant's [subjective complaints of pain]." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (per curiam) (citing Walker, 826 F.2d at 1004); see also Tredik v. Comm'r of Soc. Sec. Admin., No. 19-14606, 2020 WL 5496290, at *5 (11th Cir. Sept. 11, 2020) (per curiam) (unpublished) (citation omitted); Sewell v. Bowen, 792 F.2d 1065, 1068 (11th Cir. 1986) (citation and internal marks omitted) ("[T]he fact finder must evaluate . . . claimant's testimony as to pain, and must express a reasonable basis for rejecting such testimony.").   "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Edna H. v. Comm'r, Soc. Sec. Admin., CIVIL ACTION FILE NO. 1:18-CV-1178-JFK, 2019 WL 3766511, at *5 (N.D. Ga. Aug. 8, 2019) (citation and internal marks omitted).

Claimant contends that although "the ALJ outlined what was required in evaluating [ her] pain under the pain standard," his "finding that [ she] retained a[n] RFC for light work indicates that he failed to actually apply it as required, especially in light of the numerous impairments that afflict [ her] lower extremities," and "[i]nstead, he proceeded to recite evidence from [ her] record in a manner that emphasized unfavorable elements while minimizing evidence of [

her] limitations." [Doc. 12 at 11 (citations omitted)].[12]  She asserts that "[d]espite the ALJ's selective disregard or apparent dismissal of [certain] records[,] . . . they point to an individual who would almost certainly be incapable of performing the requisite lifting as well as the frequent standing and walking required to perform work at a light level of exertion" and that because the ALJ "failed to properly apply the Eleventh Circuit's pain standard," his failure "render[ed] the [RFC] in his decision unsupported by substantial evidence." [Id. at 14].  However, a review of the ALJ's decision belies claimant's contentions.

In his decision, the ALJ found that claimant suffered from the severe impairments of "obesity; type II diabetes mellitus; hypertension; left ventricular hypertrophy; left atrial enlargement; tricompartmental osteoarthritis in the right knee, tricompartmental osteoarthritis in the left knee; status post left ACL reconstruction (2009); bilateral calcaneal enthesophytes; multilevel degenerative disc disease, osteophytes, foraminal stenosis, and facet arthropathy in the cervical

---

[12] Claimant asserts that "the objective evidence clearly shows . . . she has underlying medical conditions of degenerative disc disease of the lumbar and cervical spines, thoracic spondylosis, osteoarthritis in the bilateral knees, diabetic neuropathy, degenerative changes in the right hand, degenerative joint disease in the bilateral sacroiliac joints, and left ventricular hypertrophy" and that her "objectively determined medical conditions are of such severity that they can reasonably be expected to cause the alleged pain," which was "best supported by the objective evidence of record, as well as the subjective evidence documenting [her] continued complaints," along with her testimony at the administrative hearing. [Doc. 12 at 10-11 (citations omitted)].

spine; mild to moderate spinal canal stenosis at C4-C5, C5-C6, and C6-C7; multilevel thoracic spondylosis; degenerative changes of the lumbosacral spine, resulting in moderate bilateral L5-S1 foraminal narrowing and severe right L4-L5 foraminal narrowing; degenerative changes of the bilateral sacroiliac joints; and degenerative changes in the symphysis pubis (hips)," as well several non-severe impairments, including visual impairments, upper extremity impairments, and major depressive disorder, (Tr. at 17-21 (emphasis and citations omitted)), and in doing so, the ALJ summarized claimant's testimony at the administrative hearing, her medical history, and the opinions of record, (Tr. at 18-27), and he then concluded that while "claimant's symptoms may be attributed to her medically determinable impairments," her allegations "that the intensity and chronicity of her symptoms would not allow her to perform even a reduced range of sedentary work on a full-time basis" was not supported by the evidence and that "although the claimant may be obese, and although [ she] may have several musculoskeletal impairments, the objective medical evidence [did] not support an assignment to sedentary work because many of the claimant's examinations ha[d] resulted in no abnormal findings." (Tr. at 24, 26).

In particular, the ALJ first discussed claimant's testimony as follows:

At the time of her hearing, the claimant was living in an apartment with her 23-year-old son and 17-year-old daughter. She testified that she weighed 312 pounds. She was being treated for deteriorating

discs in her lumbar and cervical spines; "arthritis" in her wrists, knees, and ankles; anxiety; depression; a heart murmur; palpitations; diabetes; and high blood pressure.  Although she was taking several medications that allegedly caused dizziness, constipation, and dry mouth, the claimant complained of near-constant pain in her back, neck, knees, ankles, wrists, and hands.  She claimed to get "extreme headaches," and occasional right-sided sciatica.

Functionally, she estimated that she was able to lift or carry only 10 pounds comfortably; to walk only three blocks before needing to take a break; to stand in one place only 30 minutes; and to sit an hour. Despite complaining earlier of near-constant wrist and hand pain, the claimant testified that she was able to "use her hands to do things with[,]" [] only to also testify that vacuuming "hurt [her] wrist[.]"  She testified that she did not grip pans well, so she prepared only easy meals.  She testified that she was able to dress and shower on her own, and was able to text others.  However, she was not driving.  She did not shop on her own.

When questioned by counsel, the claimant testified that she was most comfortable lying down.  She testified that long periods of walking or standing induced knee buckling and weakness, and that she was able to grip only plates, not heavy pots and pans.  She described the problems faced during a lengthy car ride to Virginia in 2018.  She testified that Tramadol caused grogginess during the day and drowsiness at night.  Nevertheless, the relief afforded by Tramadol was shortlived.  She implied that the severity of her pains did not allow her to focus for more than 40 minutes.

(Tr. at 23-24 (internal citations omitted)); see also (Tr. at 43-44, 51-64).

The ALJ then discussed that claimant "was taken to an emergency room on May 30 and June 1, 2018," and "was hospitalized on June 9, 2018," after she lost "consciousness while working," but her "initial ECG was normal" and her "stress test was negative, despite a moderately dilated left atrium and some left

ventricular hypertrophy," which "was not present on June 15, 2018," and "[a]lthough she reported urinary incontinence and asthma symptoms, an [] examination did not suggest respiratory limitation, and the pelvic examination suggested only vaginal discharge, an impairment that did not persist."  (Tr. at 24 (citations and internal marks omitted)); <u>see also</u> (Tr. at 375-481, 484-522, 619-21, 744-46, 1628-1966).  He also discussed that while claimant's blood pressure was uncontrolled at the end of July 2018, it improved with the addition of medication, (Tr. at 24 (citation omitted)); <u>see also</u> (Tr. at 650-55, 669-74, 683-88, 697-702, 761-66, 781-86, 812-17); that an "earlier report of frequent palpitations was not well-supported the following month" as her "rate was regular (RRR) the day after one episode of supravent[r]icular tachycardia 'terminated spontaneously,'" (Tr. at 24 (citation omitted)); <u>see also</u> (Tr. at 651, 683-88, 697-702, 783, 812-17); that her "complaints of diffuse pain were better-supported on September 24, 2018," as there was "a 'severe valgus deformity' in each knee at that time," though her strength was also "5/5 throughout" and "[p]ain medication was not prescribed and the claimant was not even taking an over-the-counter pain medication the following month," (Tr. at 24 (citations omitted)); <u>see also</u> (Tr. at 293, 677-82, 691-96, 788-811); that she was not taking her medication on October 25, 2018, which "explained her reports of 'worsening palpitations,' as well as an elevation in her blood pressure," and she "did not comply with the advice to increase her

Metformin dose" from this visit, which, "[t]ogether with a poor diet, [] explained why her glucose was above 600 on November 18, 2018," though claimant had "no objective deficits" and was nevertheless "asymptomatic, aside from a possible headache" and being "mildly hypertensive," (Tr. at 24 (citations omitted)); see also (Tr. at 703-22, 818-59); and that "[n]o deficits were seen on December 13, 2018," including that her "heart rate was regular," even though "her HgB A1C was up to 13.7%," (Tr. at 24 (citations omitted)); see also (Tr. at 723-29, 860-67).

The ALJ further summarized claimant's medical records as follows:

According to the records from Grady, the claimant's HgB A1C was down to 8% in March 2019. She was losing weight. An examination of her lower extremities was normal, despite the claimant's reports of trace afternoon edema. On April 4, 2019, she was seen by . . . an orthopedist. His comments regarding the location of the claimant's pain were not entirely consistent. Nevertheless, despite some tenderness and a positive facet load test, [the orthopedist's] examination was normal. For example, the claimant ambulated without difficulty. Her strength was 5/5 in both arms and legs, her reflexes were symmetric, and the range of motion in her joints was "good." Even though she was not taking Januvia as prescribed, the claimant's HgB A1C was down to 6% in May 2019. The claimant's gait was normal. In fact, she was walking three to four days a week. That activity gave her more energy. The claimant's postprandial diarrhea was not occurring with smaller snacks.

[T]he claimant's right CMC joint nodule did not interfere with the movement of her wrist in May 2019. An examination on June 14, 2019, was not suggestive of tingling and numbness in her feet. On June 24, 2019, a retina specialist wrote that the claimant's "diabetic disease" was stable, and that the claimant's vision was 20/70. However, no evidence of diabetic retinopathy had been seen in October 2018, January 2019, or April 2019. In [] April 2019, the claimant's "final

refraction" visual acuity had been 20/20 in each eye.   [The consultative ophthalmologist's] findings on September 24, 2019, were additional support that the claimant did not have diabetic retinopathy.  Despite 1+ cataracts, the claimant's corrected vision was at least 20/40.   Her visual acuity was 20/30 in February 2020. Therefore, with respect to the claimant's ability to see, the evidence supports the finding by the medical consultant who conducted the most recent file review. . . .

On June [1]9, 2019, the claimant was examined by a spine specialist. Like before, the claimant's spine was tender.  However, there was no muscle atrophy or weakness in the claimant's lower extremities.  The claimant's gait was non-antalgic.   The lack of strength in the claimant's right wrist was not clearly objective.  Rather, [the doctor] wrote only that the claimant's right wrist cyst, that was removed less than two months later, was "painful when pushing against resistance."   That addendum does not appear on the doctor's handwritten notes.  In sum, the claimant's reports of worse pain and a decrease in her vision were not well-supported in June 2019.

As noted above, the claimant's right ganglion cyst was removed on July 26, 2019. That was after an examination showing no loss of sensation or loss of motion in her hands.  Before the surgery the claimant's examinations did not suggest obstructive sleep apnea.  The claimant's right upper extremity examination was unremarkable on August 14, 2019.

The claimant's left knee was swollen on September 26, 2019, and the sensation in her feet was somewhat diminished.  However, [t]he claimant was not taking even an over-the-counter pain medication (Tylenol).  Later, moreover, she implied that she was running her household, noting that she was a "superwoman" who was not "focusing on herself."   As explained above, an examination of the claimant's upper extremities was not consistent on November 25, 2019.  Aside from a positive Tin[]el's, [ the] examination was normal.

On January 8, 2020, an examining podiatrist implied that the claimant was having ambulatory difficulties.  However, thirteen days later, the claimant was able to walk without discomfort because of new diabetic

shoes and custom inserts.  The claimant was ambulatory on March 2, 2020.  On that date, [the physical exam] findings were the same as the findings on November 25, 2019, the only addition being a reference to a positive log roll test.  As noted above, [ the] upper extremity findings were not consistent.  On March 27, 2020, an orthopedic spine specialist met with the claimant via "telemedicine."  Thus, there was no way for the doctor to confirm a "moderate global decrease range of motion," or, a "normal" "muscle bulk" and "bilateral major joint motion."  On May 26, 2020, and May 28, 2020, the claimant's reports concerning dyspnea with exertion were not consistent.  On May 28, 2020, the claimant was contacted by telephone.  Thus, there was no basis for [the doctor's] "bilateral hand weakness" diagnosis.  Finally, the undersigned must address the treadmill test completed on June 26, 2020, less than one month before she was hospitalized for COVID-19.  Of note, she "fainted" four minutes into the testing.  However, she had been hyperventilating.  She later explained that the prospect of cardiac testing was stressful, given the death of her children's father in a CDU.  It is also clear that the EKG did not uncover any abnormalities.

(Tr. at 25-26 (alterations, citations, and internal marks omitted)); see also (Tr. at 121-22, 141-42, 709, 730, 882-93, 902-08, 923-25, 932-42, 949-63, 966-96, 1005-11, 1013, 1021, 1023-41, 1047-61, 1074-82, 1084-91, 1093-1101, 1107-31, 1131-48, 1154-61, 1164-71, 1186-1201, 1211-19, 1233-34, 1239-1626, 1967-2013, 2018-19, 2024, 2026).

The ALJ also discussed a consultative disability examination of claimant performed on January 31, 2019, by Oluropo A. Ayeni, M.D. ("Dr. Ayeni"), stating:

[E]ven though [claimant] complained of arthritis "on both thumbs, wrist, ankles, knees, and back" for over "20 years," an examination by Dr. Ayeni was relatively unremarkable on January 31, 2019. Specifically, [claimant] was able to get on and off the exam table on her own and her gait was steady.  The range of motion in her lower back and neck was normal, despite tenderness in her lumbosacral spine.  The claimant's grip and pinch strength was 5/5 bilaterally.

> Despite a "restricted" [straight leg raise], the claimant's joints were fully mobile and were not swollen.  Dr. Ayeni's "neurologic" findings were not consistent with a "diabetic neuropathy . . . mostly in the upper and lower extremities."   In fact, Dr. Ayeni did not give any "examples" of upper extremity impairment, writing "normal" instead.

(Tr. at 24-25 (last alteration in original) (citations omitted)); <u>see also</u> (Tr. at 732-41).

The ALJ also considered the state agency medical consultants' findings,[13]

---

[13] On April 24, 2019, claimant's DIB and SSI applications were denied at the initial level, (Tr. at 73-106), and the determination included a physical RFC assessment performed on February 25, 2019, by Frederick Wener, M.D. ("Dr. Wener"), a non-examining state agency medical consultant, who concluded that claimant could lift or carry 20 pounds occasionally and 10 pounds frequently, could stand or walk for about 6 hours in an 8-hour workday, could sit for a total of 6 hours in an 8-hour workday, and was unlimited in her ability to push and pull, except as shown for lifting and carrying, (Tr. at 82, 87, 99, 104).  Dr. Wener also concluded that claimant could frequently balance, but that she could only occasionally stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds.  (Tr. at 83, 99-100).  He further found that claimant was limited to frequent fingering with both hands, but that she had no communicative limitations.  (Tr. at 83-84, 100-01).  Finally, Dr. Wener found that claimant should avoid concentrated exposure to extreme heat and hazards.  (Tr. at 84, 101).  Subsequently, on January 31, 2020, claimant's DIB and SSI applications were denied at the reconsideration level, (Tr. at 109-48), and included in this determination was a physical RFC assessment performed on January 6, 2020, by Marvin Bittinger, M.D. ("Dr. Bittinger"), another non-examining state agency medical consultant, who concluded that claimant could lift or carry 20 pounds occasionally and 10 pounds frequently, could stand or walk for about 6 hours in an 8-hour workday, could sit for a total of 6 hours in an 8-hour workday, and was unlimited in her ability to push and pull, except as shown for lifting and carrying, (Tr. at 125-26, 145-46).  Dr. Bittinger also concluded that claimant could frequently climb ramps and stairs, balance, and stoop, but could only occasionally kneel, crouch, crawl, or climb ladders, ropes, or scaffolds.  (<u>Id.</u>).  He further found that claimant had no manipulative, visual, communicative, or environmental limitations.  (Tr. at 126, 146).

specifically explaining that the "reconsideration medical consultant's manipulative findings were more supported and more consistent with the totality of the evidence and persuasive, than the manipulative findings of the initial medical consultant," (Tr. at 27 (citations omitted)); see also (Tr. at 82-87, 99-104, 125-26, 145-46), and he also addressed the third-party adult function report provided by claimant's son on October 29, 2018, finding the evidence did not support his assertions that claimant's "medications were causing dizziness, fatigue, drowsiness, nausea, and restlessness"; that claimant "was not able to do chores long even with 'assists'"; and that she "was unable to stay in one position 'very long' or lift more than [five] pounds," (Tr. at 25 (citation omitted)); see also (Tr. at 331-38).  Thus, the ALJ clearly discussed claimant's subjective complaints in the context of the medical evidence of record in formulating claimant's RFC, and the Court finds that the ALJ partially discredited claimant's testimony regarding her pain and other symptoms as inconsistent with the evidence of record and that this finding is supported by substantial evidence.

Indeed, the record demonstrates, consistent with the ALJ's summary, that while claimant complained of chest pain and shortness of breath on May 30 and June 1, 2018, x-rays and CT scans of her chest showed no acute cardiopulmonary disease or pulmonary embolus and she had a normal ECG, and though she was admitted to Atlanta Medical Center from June 9 through June 12, 2018, after she

fainted while at work at the Georgia Aquarium, a stress test was negative for ischemia and it was thought that her chest pain was likely costochondritis, with her remaining chronic problems noted as stable. (Tr. at 375-481, 484-522, 619-21, 744-46, 1628-1966). On July 31, 2018, claimant presented at Grady's Cardiology Clinic for an initial consultation for her chest pain, at which time she reported that she had just recently been diagnosed with type II diabetes. (Tr. at 650-55, 761-66). Claimant's EKG was unremarkable, and she was diagnosed with uncontrolled hypertension, chest pain that was "[n]onanginal in character," palpitations for which a Holter monitor was ordered, diabetes, and hyperlipidemia, (Tr. at 654), and by her next appointment on August 16, 2018, her hypertension was noted as controlled and she had not had any episodes of syncope since June, (Tr. at 669-74, 781-86).

On September 24, 2018, claimant presented at Grady's Rheumatology Clinic for an initial evaluation of her joint pain in her ankles, knees, hands, and lower back, along with swelling in her thumbs, knees, and ankles, (Tr. at 677-82, 691-96, 788-811), and on examination, it was noted that she had a full range of motion about her cervical spine with some pain around her shoulders, that she was tender to palpation about her lower back, that she had normal strength throughout, that she had a cyst over her right wrist, and that she was tender to palpation over her

right second and third metacarpophalangeal joints, (Tr. at 680).[14] On the following day, claimant returned to the Cardiology Clinic, (Tr. at 683-88, 697-702, 812-17), and it was noted that her hypertension was well controlled, that the Holter monitor showed a short episode of supraventricular tachycardia that terminated spontaneously, that no intervention was necessary, and that she was discharged from the cardiac clinic and instructed to follow up with her primary care physician, (Tr. at 683-84, 688), which she did on October 25, 2018, (Tr. at 703-09, 818-24).

On November 18, 2018, claimant was admitted to Grady overnight for hyperglycemia, but she was otherwise asymptomatic, and examination showed that she had 5/5 strength in all four extremities, normal muscle tone, and no joint deformities or swelling. (Tr. at 710-22, 825-59). Claimant was started on insulin on January 3, 2019, (Tr. at 868-74), and marked improvement was noted on February 21, 2019, (Tr. at 875-81, 927-32). On March 21, 2019, claimant presented at Grady for a follow-up evaluation, (Tr. at 894-901, 942-49, 1101-07), and it was noted that her diabetic condition was much improved, that her hypertension was

---

[14] X-rays of claimant's cervical spine, hands, and ankles on September 24, 2018, showed osteoarthritis of the right first carpometacarpal joint, degenerative disc disease worse at C5/C6 with dorsal and ventral osteophytes but no acute fracture, calcaneal enthesophyte of the ankles, and mild sclerosis of the bilateral sacroiliac joints without ankylosis or erosions. (Tr. at 907).

under control, and that she should take Tylenol for pain for her degenerative joint disease, as well as lose weight and exercise, (Tr. at 897-98).  On April 4, 2019, claimant returned to Grady for evaluation of her chronic neck and low back pain with no associated radiation or numbness, (Tr. at 902-08, 949-63, 1107-14), and it was noted that claimant had not yet tried any muscle relaxants, physical therapy, or injections to those areas, (Tr. at 903).  Examination revealed that claimant had appropriate muscle mass in her bilateral upper and lower extremities, as well as 5/5 strength; that her reflexes were symmetric in all four extremities; that she ambulated without difficulty and without an assistive device; that she was tender to palpation over her right trapezius, but had negative facet loading and Spurling's tests; that she was tender to palpation over her lumbar paraspinals and spinous processes and had a positive bilateral facet loading test, but had negative bilateral straight leg raise and Patrick's tests; and that she had a "[g]ood range of motion of all extremities with joints all appearing to be within normal limits."  (Tr. at 906).[15] It was noted that claimant's neck pain was "likely myofascial (trapezius)," though she did "have evidence of DDD/DJD on cervical xray," but "no evidence of myelopathy/radiculopathy," and that her low back pain was possibly "facet

---

[15] It was noted that an x-ray of claimant's right knee from March 23, 2017, showed "[t]ricompartmental osteoarthritis most pronounced in the lateral tibiofemoral compartment," with no "evidence of acute fracture" and "[t]race joint effusion." (Tr. at 907).

related," and it was recommended that claimant try "diclofenac gel that was prescribed recently" and continue with Tylenol and home exercises, as well as consider losing weight, water aerobics, and a TENS unit.  (Tr. at 907-08).[16]  As of May 8, 2019, claimant reported that she was walking a mile to a mile and a half in her neighborhood every other day and that it was giving her more energy, (Tr. at 974-76),[17] and on May 23, 2019, it was noted that her diabetes and hypertension were under control; that while her pain limited her movement, it was recommended that she use Tylenol regularly; that the nodule on her right wrist was not causing pain with palpation or tingling and numbness in her fingers, but was causing intermittent weakness; and that her hypokalemia had resolved, (Tr. at 977-86, 1119-26).

On June 19, 2019, claimant presented at the Emory Orthopaedic and Spine Clinic and saw Sangwook Tim Yoon, M.D. ("Dr. Yoon"), for evaluation of her neck

---

[16] An x-ray of claimant's lumbar spine dated April 18, 2019, showed "[m]inimal degenerative changes of the lower lumbar spine[.]"  (Tr. at 918, 922).

[17] An MRI of claimant's cervical spine on May 18, 2019, showed "[m]ultilevel cervical spondylosis, most pronounced at the C5-6 and C6-7 levels" and "[s]uggestion of faint abnormal cord signal ventrally at the C5-6/C6-7 level which may be on the basis of degenerative compressive myelopathy," while an MRI of her pelvis from this date showed "[d]egenerative changes of the lumbosacral spine resulting in . . . severe foraminal narrowing at right L4-L5" and "[d]egenerative changes involving the anterior aspect of the sacroiliac joints," but no "inflammatory changes of the SI joints."  (Tr. at 996-99).

and low back pain. (Tr. at 1005-10, 1088-91). Claimant reported that she had

suffered from her neck and low back pain for about eight to ten years, describing

her neck pain as an achy feeling "localized to C7" without any radiation or

numbness and her low back pain as a sore, achy pain that radiated from her

"lumbar region to [her] posterior thigh and stop[ped] at [her] knee." (Tr. at 1005).

She relayed that her pain was relieved with resting or sitting and aggravated by

movement and walking and that she took Tylenol for her pain. (Id.). Upon

examination, Dr. Yoon observed that claimant had normal girth and no atrophy in

all four limbs; that she had 5/5 in all areas of her motor examination, with the

exception of her right wrist which was 4/5 due to the cyst that was "painful when

pushing against resistance"; that she had 5/5 upper motor strength; that she had

a "[n]ormal non-antalgic gait pattern"; and that her Spurling's and straight leg

raise tests were negative. (Tr. at 1007). Dr. Yoon's impressions at this time were

chronic neck and low back pain, as well as myofascial pain, and that claimant was

"not an operative candidate" and would be referred "for maintenance of

myofa[s]cia[l] pain through PT, anti-inflammatories, diet, and weight loss." (Tr.

at 1008).

On July 26, 2019, an excision of claimant's right wrist ganglion was

performed, (Tr. at 1028-39, 1135-47), and on August 14, 2019, she had no

complaints, was pleased with the appearance of her wrist, had a pleasant mood,

and ambulated without an assistive device, (Tr. at 1039-41, 1147-48).   On
September 25, 2019, it was noted that claimant's diabetes remained controlled,
though she was having hypoglycemia episodes the prior two weeks, and she
reported that she was walking daily and using bands for chair exercises, (Tr. at
1041-47, 1148-54), and on the following day, she reported that she had been
suffering from bilateral knee pain for the last month, (Tr. at 1047-53, 1080-81, 1154-
61).   On examination, it was observed that claimant had some "[s]oft tissue
swelling on [the] medial aspect of [her left] knee," as well as decreased range of
motion and pain, (Tr. at 1050), and it was noted that her bilateral knee pain was
likely due to osteoarthritis, since she had no "effusions or features of inflammatory
pain" and that she would be referred to physical therapy, provided with knee
exercises, and was instructed to continue taking Tylenol and to lose weight, (Tr. at
1051).

On November 25, 2019, claimant reported that both her neck and back pain
had radiating symptoms and that her low back pain was worse when lying on her
back with her legs straight and improved with acetaminophen.  (Tr. at 1054-61,
1081-82, 1165-71)  On exam, claimant had a non-antalgic gait, was able to heel-toe
walk without difficulty, had no pain with active or passive range of motion of her
cervical spine, had 5/5 upper and lower bilateral extremity motor function, and
had various negative tests, though she had a positive bilateral Tinel's test.  (Tr. at

1058-60).  Claimant was assessed with cervical spondylosis at multiple levels, lumbar back pain with spondylosis and degenerative changes at multiple levels, neuroforaminal stenosis at L4-5 and L5-S1, cubital tunnel syndrome with her right greater than her left, and bilateral hip arthritis with cystic changes, and it was recommended that she lose weight and consider further testing should her conditions progress.  (Tr. at 1060).

On December 12, 2019, claimant's hypertension was not under control, and she reported "neuropathic symptoms consistent with microvascular disease," (Tr. at 1061-66, 1172-77),[18] and on February 12, 2020, she complained of intermittent headaches and pressure over her eyes, though her diabetes was noted as controlled, (Tr. at 1066-73, 1178-85).  On March 2, 2020, claimant complained of "right sided paraspinal neck pain, transverse lumbar back pain, and left hip pain,"

---

[18] On December 13, 2019, claimant was evaluated at the Hanger Clinic for diabetic shoes and inserts to help decrease claimant's pain as it was noted her "[a]vocation [a]ctivities" included cleaning, cooking, caring for her children, walking one to two miles, and shopping, (Tr. at 2015-17 (emphasis omitted)), and on January 8, 2020, claimant saw Jimmy L. Gregory, DPM ("Dr. Gregory"), for numbness and burning pain in her feet and callus on her great toes, and it was noted that the "[g]eneral appearance of [claimant's] bones, joints, range of motion, musculature, and strength [were] within normal limits," and Dr. Gregory assessed her with neurological manifestations of her diabetes, obesity, onychomycosis, and acquired keratoderma and he performed a toenail debridement, (Tr. at 1233-34).  On January 21, 2020, claimant returned to the Hanger Clinic and received diabetic shoes and inserts, and it was noted that claimant was able to ambulate without difficulty.  (Tr. at 2018-19).

but that "the left hip pain [was] the primary source of her pain and discomfort[.]" (Tr. at 1074-79, 1186-90). She explained that her pain was at its "worst in the morning and improve[d] with mobility and [was] worse again at the end of the day." (Tr. at 1074). It was noted that the only medication claimant had tried was acetaminophen, that she had not engaged in physical therapy recently as she only had a remote history of it, and that she had not had any spinal injections or surgery. (Tr. at 1075).

On March 27, 2020, claimant engaged in a telemedicine visit with John C. Keel, M.D. ("Dr. Keel"), of the Emory Orthopaedic and Spine Clinic for her chronic neck and lumbar pain, though her "[c]hronic lumbar pain [was] the majority complaint" and her "chronic neck pain axial in nature" was "not a major focus." (Tr. at 1084-87). Claimant described her pain as "a stiff aching quality" that was "[w]orse with lifting, activity, [and] prolonged positioning" and relieved with rest or sitting. (Tr. at 1084-85). She also relayed that her "[d]exterity and hand control [were] good in spite of hand arthritis." (Tr. at 1085). Dr. Keel reviewed claimant's MRIs and noted that her cervical MRI showed significant stenosis and that her pelvis MRI, which included her lumbar, showed "nonsevere age-appropriate degeneration," and he recommended that claimant "[e]xercise as tolerated for core flexibility and strength," take over-the-counter acetaminophen in combination

with an anti-inflammatory, and noted that he may consider referral to physical therapy. (Tr. at 1086).

On May 26, 2020, claimant had a telehealth evaluation with Grady's Cardiology Clinic, (Tr. at 1191-98), at which time she reported that she had gained weight and was having dyspnea on exertion "with about [two] blocks," as well as "atypical chest pain," (Tr. at 1191, 1193), and on May 28, 2020, it was noted that her dyspnea on exertion may be due to obesity and deconditioning and that her symptoms as reported may be more concerning for stable angina, (Tr. at 1198-1201). Claimant denied any "acute medical complaint" during her virtual appointment on June 10, 2020, (Tr. at 1204-10); however, she hyperventilated and fainted without losing consciousness during her treadmill exercise stress test on June 26, 2020, and rapid response was contacted to assess her, but there were no abnormalities noted on her EKG, her blood pressure remained stable, and it was noted that her "children's father died during an overnight hospitalization for a stress test" and she therefore wanted "to be discharged and to follow up as an outpatient," (Tr. at 1211-19).[19]

---

[19] From July 23 through July 29, 2020, claimant was hospitalized and treated for pneumonia due to the COVID-19 virus. (Tr. at 1239-1626, 1967-2013). In addition to claimant's testimony at the administrative hearing held on September 3, 2020, (Tr. at 36-72), which the ALJ accurately summarized in his decision, see (Tr. at 23-24), claimant also completed an adult function report on October 29, 2018, (Tr. at 322-29), which largely mirrored the third-party adult function report completed

"The ALJ has the discretion to discredit a claimant's subjective complaints about . . . her symptoms as long as the ALJ considers the entire record and gives specific reasons for the weight given to the claimant's statements," Stone v. Berryhill, CIVIL ACTION NO. 1:16-CV-03563-WSD-LTW, 2018 WL 1887299, at *10 n.12 (N.D. Ga. Jan. 18, 2018) (citation omitted), adopted by 2018 WL 774524, at *4 (N.D. Ga. Feb. 8, 2018), and claimant "may disagree with the ALJ's interpretation of the evidence, but this Court's job is not to re-weigh the evidence," Vanwinkle v. Saul, CV 118-143, 2019 WL 3562129, at *9 (S.D. Ga. July 8, 2019) (citation omitted), adopted by 2019 WL 3554651, at *1 (S.D. Ga. Aug. 5, 2019). "Substantial evidence supporting the ALJ's articulated reasons is all that is required to uphold the ALJ's decision, and, as fully detailed above, the record contains evidence supporting the ALJ's reasoning -- other possible outcomes notwithstanding." Priester v. Berryhill, CV417-149, 2018 WL 6683356, at *5 (S.D. Ga. Mar. 20, 2018) (citations omitted), adopted by 2018 WL 6653205, at *1 (S.D. Ga. Dec. 19, 2018).

Despite claimant's contentions otherwise, see [Doc. 12 at 11-12], the ALJ evaluated claimant's subjective complaints of pain in comparison to the medical evidence of record and noted various inconsistencies, see generally (Tr. at 18-27). The ALJ's decision reveals that he applied the appropriate standard and discussed

―――――――――――――

by her son on the same date, see (Tr. at 331-38), and discussed by the ALJ, see (Tr. at 25).

adequate reasons, considering claimant's medical history, diagnoses, and the opinions and other evidence of record, for partially discounting claimant's subjective complaints.  See Huigens v. Soc. Sec. Admin., Comm'r, 718 F. App'x 841, 848 (11th Cir. 2017) (per curiam) (unpublished); Lewis v. Saul, No. CV 118-096, 2019 WL 2953289, at *10 (S.D. Ga. July 9, 2019) (citation omitted) (finding ALJ properly analyzed claimant's subjective complaints of pain under SSR 16-3p where "he carefully compared [claimant's] subjective complaints to the objective evidence to determine whether [claimant's] medical conditions could be expected to give rise to the level of limitations she claimed" and he "acknowledged [claimant's] impairments, discussed the symptoms reasonably accepted to be consistent with [the] subjective complaints and the objective medical evidence, and limited [the] RFC accordingly"), adopted by 2019 WL 3554632, at *1 (S.D. Ga. Aug. 5, 2019).   In fact, the ALJ explicitly discussed the subjective evidence submitted by claimant related to her symptoms, and he then found that the objective medical evidence was not entirely consistent with this subjective testimony.   See (Tr. at 18-27).   In particular, the ALJ discussed claimant's conservative treatment of her knee pain and that her blood pressure improved with medication; that her various physical examinations were normal, including her respiratory and cardiovascular exams, as well as her consultative exam with Dr. Ayeni in January 2019; that multiple examinations in 2019 indicated a normal

gait, no muscle atrophy, normal range of motion, and full upper and lower extremity strength; that while a May 2019 exam showed a nodule on claimant's right wrist, it did not interfere with her movement of her wrist and was removed in July 2019 without loss of sensation or hand motion; that although a podiatrist implied claimant had ambulatory difficulties in January 2020, she was able to walk without discomfort after obtaining diabetic shoes and inserts thirteen days later and again during a March 2020 exam; and that claimant reported activities such as walking three to four days per week and running her household like "she was a 'superwoman,'" among other findings.  (Tr. at 24-26 (citations omitted)); see also (Tr. at 293, 652, 670, 680, 683, 725, 734-35, 757, 783, 793, 862-63, 889-90, 906, 969, 971, 975, 1007, 1025, 1027, 1040, 1047, 1050, 1075, 1169-70, 1215, 1233, 2018).  Thus, a review of the ALJ's decision reveals that he adequately explained how the cited record evidence was inconsistent with claimant's allegations of disability, providing a sufficient objective comparison of the claimant's statements to the medical evidence of record to permit meaningful review of his decision, see SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); see also Dyer, 395 F.3d at 1212. Indeed, "the ALJ did not simply issue a broad rejection of [claimant's] testimony regarding the subjective effects of [her] symptoms but instead, []he considered [claimant's] overall medical condition and placed on the record explicit reasons for [partially] rejecting [her] testimony and finding that [her] impairments were

not severe enough to be disabling." Berkel v. Colvin, Civil Action File No. 1:12–CV–03558–AJB, 2014 WL 806864, at *18 (N.D. Ga. Feb. 27, 2014) (citations omitted).

Determinations of a claimant's subjective complaints of pain "are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." Barnes v. Berryhill, CIVIL ACTION FILE NO. 3:16-cv-00141-RGV, 2018 WL 10879110, at *22 (N.D. Ga. Mar. 13, 2018) (alteration in original) (citations and internal marks omitted), aff'd, 763 F. App'x 835 (11th Cir. 2019) (per curiam) (unpublished); see also Johnson v. Colvin, No. CV413–031, 2014 WL 1330687, at *4 n.5 (S.D. Ga. Mar. 28, 2014) (citation and internal marks omitted) ("As a general rule, [] determinations [regarding claimant's subjective complaints of pain] are for the ALJ."), adopted at *1. And, "[t]he question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." Werner v. Comm'r of Soc. Sec., 421 F. App'x 935, 939 (11th Cir. 2011) (per curiam) (unpublished) (footnote omitted); see also Whipple v. Berryhill, CV 316-071, 2017 WL 5492008, at *4 (S.D. Ga. Oct. 26, 2017) (citation omitted), adopted by 2017 WL 5474570, at *1 (S.D. Ga. Nov. 14, 2017). That is, "[a] clearly articulated [] finding [regarding claimant's subjective complaints of pain] with substantial supporting evidence in the record will not be disturbed by a reviewing court even if some of the reasons for questioning the claimant's [allegations] stated by the ALJ

are suspect." <u>Sarah S. v. Comm'r, Soc. Sec. Admin.</u>, CIVIL ACTION FILE NO. 1:17-cv-03812-AJB, 2019 WL 1149781, at *13 (N.D. Ga. Mar. 11, 2019) (citation and internal marks omitted); <u>see also</u> <u>Meehan v. Comm'r of Soc. Sec.</u>, 776 F. App'x 599, 603 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted).

Claimant points to a few examples from the ALJ's decision in an effort to show that the ALJ "recite[d] evidence from [ her] record in a manner that emphasized unfavorable elements while minimizing evidence of [ her] limitations." [Doc. 12 at 11-12 (citation omitted)].  Claimant's argument, however, is "nothing more than an attempt to reargue the weight of the evidence before the ALJ," but "[r]earguing the weight of the evidence is an unavailing tactic on appeal" as it "is not this [C]ourt's role to reweigh the evidence before the ALJ." <u>Kristie G. v. Saul</u>, Case No. 1:19-cv-00141-JCB, 2021 WL 698160, at *4 n.19 (D. Utah Feb. 23, 2021) (citation omitted).  Moreover, the ALJ's summarization of the "medical evidence that was both favorable and unfavorable to [his] determination disproves [claimant's] assertion that the ALJ 'recite[d] evidence from [ claimant's] record in a manner that emphasized elements not relevant to her pain complaints while minimizing evidence of . . . pain.'" <u>Dunnivan v. Kijakazi</u>, Case No. 3:20-cv-975-SMD, 2022 WL 1303088, at *4 (M.D. Ala. May 2, 2022) (third and fifth alterations in original) (citation omitted).  Indeed, in this case, "[a] review of the medical records and the ALJ's written decision shows that the ALJ considered the

record as a whole and applied proper legal standards," Olson v. Berryhill, CASE NO. 3:16-CV-57-MSH, 2017 WL 1949221, at *3 (M.D. Ga. May 10, 2017), and claimant's "claim of error is without merit," Slone v. Berryhill, CIVIL ACTION NO.: 2:17-cv-130, 2019 WL 1373661, at *6 (S.D. Ga. Mar. 11, 2019), adopted by 2019 WL 1368633, at *1 (S.D. Ga. Mar. 26, 2019); see also Jackson v. Berryhill, CV 117-050, 2018 WL 2250919, at *8 (S.D. Ga. Apr. 18, 2018) (citation omitted), adopted by 2018 WL 2247254, at *1 (S.D. Ga. May 16, 2018).

"While [claimant's] argument that [s]he is more limited may be a permissible view of the evidence, so too is the ALJ's viewpoint, and in light of the medical evidence finding [claimant] less impaired, . . . and [claimant's] daily activities, the ALJ had substantial evidence to [partially discredit claimant's subjective complaints of pain]." Elder S. v. Saul, CIVIL ACTION NO. 1:18-CV-00753-LTW, 2019 WL 4744826, at *12 (N.D. Ga. Sept. 30, 2019) (citation omitted). Thus, contrary to claimant's assertions, the ALJ properly considered claimant's subjective complaints along with the objective evidence of record as required by the Regulations, and "substantial evidence cited by the ALJ supports the adverse [] determination."[20] Werner, 421 F. App'x at 938; see also Porto v. Acting Comm'r

---

[20] Claimant also argues that the ALJ improperly discredited her subjective complaints by "attempt[ing] to dismiss other evidence he [found] inconvenient by arguing that the notes were from 'telemedicine' appointments and so the doctors could not have confirmed their findings" without first "attempt[ing] to recontact

of Soc. Sec. Admin., 851 F. App'x 142, 148 (11th Cir. 2021) (per curiam)

(unpublished); Lustgarten v. Comm'r of Soc. Sec., 794 F. App'x 843, 849 (11th Cir.

2019) (citation omitted) (per curiam) (unpublished).

## V. CONCLUSION

For the reasons stated, the Commissioner's decision denying claimant's

applications for DIB and SSI is **AFFIRMED**.

**IT IS SO ORDERED**, this 30th day of August, 2022.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

these doctors to obtain an explanation or clarification regarding their notes." [Doc.
12 at 12 (citation omitted)]. However, the "mere fact that the ALJ did not . . .
consider certain treatment records in the manner that [c]laimant desired does not
trigger the ALJ's duty to recontact [a doctor], nor does it render the ALJ's treatment
of the [consideration of those records] erroneous." Gibson v. Comm'r of Soc. Soc.,
Case No: 6:17–cv–519–Orl–41GJK, 2018 WL 1830848, at *7 (M.D. Fla. Mar. 7, 2018),
adopted by 2018 WL 3997925, at *3 (M.D. Fla. Aug. 21, 2018); see also Warden v.
Saul, CIVIL ACTION NO.: 5:17-cv-168, 2019 WL 4671514, at *11 (S.D. Ga. Aug. 30,
2019) (alteration, citations and internal marks omitted) (explaining that "[w]here
the evidence of record is insufficient and the ALJ cannot determine whether a
claimant is disabled, the ALJ may take a number of steps, including recontacting
a medical source[ or] requesting additional evidence," but "the mere
determination [that] a medical opinion is inconsistent does not require an ALJ
recontact the source before discounting that evidence" and an ALJ "is also not
required to recontact a medical source where the ALJ has the necessary
information to determine claimant's impairments, her [RFC], and her ability to
work"), adopted by 2019 WL 4670771, at *1 (S.D. Ga. Sept. 24, 2019).